The opinion of the court was delivered by
Duncan, J.
The court have been called on by the defendant in error, to file their opinion, with the reasons, of record. •
I have, therefore, examined the questions of law with more attention than their importance, or any difficulty in their solution required. The action is slander, for these words, “ you have killed Bob Waters, you have poisoned him, and I can prove it.” On the plea of not guilty, on examination of the plaintiff’s witnesses, it appeared, that Bob Waters was alive when the words were spoken, and, therefore, it was contended, that the plaintiff could not have killed him, and as he could not be put in jeopardy of his life, for the murder of a living man, this action for defaming his character could not be supported; and such was the-opinion of the court in their charge delivered to the jury. To this the plaintiff in error excepted, and we are at this day seriously called on to decide, whether these words are actionable. Did they convey the imputation of crime? Could they, standing alone, as they did, convey to the hearers, any other meaning than a charge of murder : murder in the first degree: murder by poison: cruel, deliberate murder. “You killed Bob Waters, youkilled him by poison, and I can prove it by one of your own family.” No.assertion could be more positive. It was a circumstantial statement of a fact, that Bob Waters was dead, and that the plaintiff killed him: a statement of the manner in which he killed him, by poison, and a pledge that he could prove it, and stating farther, that he could prove it by one of the plaintiff’s own family. There was nothing conjectural in the asseveration. Putting the epithets to it, and adding time and place, it would be nearly as certain as an indictment could express it: It is now insisted on by the counsel of the defendant in error, that these words are not actionable. It was proved, that they were uttered by the defendant without any reference to Bob Waters as a living man, and the justification of the defendant is one that has not been heard of more than a century. It is not, that the words were true, but were only a notorious lie fabricated by the defendant. If this Was considered a defence, the most learned lay man would be filled with amazement. It must be left to the initiated in the law, to assign some reason for this unaccountable and unnatural conclusion. None has been given: but it is contended, that there was a decision to this effect more than 100 years ago, and that we are bound by that decision, though it confounds our reason and shocks our understanding. We arc not inquiring into a rule of property, where precedents are revered, but considering in an action of slander, whe *48 ther the defendant has uttered defamatory words of the plaintiff? imputed to him the commission of a crime, punishable with death. Now the wisdom of the law has been declared, that precedents in actions for words are of little authority. So early as the reign of the second Charles, a very enlightened judge, O. J. Bridgman was desirous of shaking the fetters of precedent in actions for words, Which were even then beginning to be considered as a reproach to the law, by declaring, that in case of scandal he was not satisfied to go by precedents, and held that to be slander which was not so 20 years before. Falkner v. Cooper, Carter, 55. In the reign of Jlnne, in Harrison v. Thornborough, 10 Mod. 196, the whole court ■ declared, that precedents were not of equal authority as in other actions, because norma loquendi is the rüle for the interpretation of words, and that rule was different in one age, from, what it was in another. Words that were not actionable 100 years ago, are now actionable. With these precepts of wisdom, let us examine the precedents of folly, to which we have been referred, and then choose which road we will take, the ancient course which strained and perverted every thing, to give some possible innocent meaning to words which their natural import would not bear, or the more modern one, that words are to be taken in that sense that is most natural and obvious, and in which those to whom they were spoken would be sure to understand them. The leading case to which we have been referred, and the parent of all others of that family, Snag v. Gee, 4 Co. 16, decided in the reign of Elizabeth, has not the weight of Lord Coke’s opinion to support it: he was not appointed a judge until some time in the reign of James. There the plaintiff showed in his declaration, that the defendant had a wife then living when the defendant said to him, “ thou hast killed my wife, and thou art a traitor,” and adjudged the action did not lie. It appeared in the declaration, that the defendant had a wife then living with him. Now, if one neighbour said to another thou hast killed my wife, when it was notorious that the wife was then in her husband’s house, this would show, that the defendant did not intend to impute to the plaintiff the crime of murder, but used it in some other sense. It is not uncommon for a certain class of men, when only soundly beat to cry out, “ Oh! but you have kilt me.” I have heard it when a boy again and again, in my native county. The audience would well understand that the man did not mean to say, that‘the was dead.” It is impossible to treat this subject gravely. I thought, there was an evident effort by the counsel of the defendant to preserve a becoming gravity of face, I observed a kind of sub risus curling on their lips; and'I must be forgiven, for I mean no disrepect to these worthy gentlemen for declaring, that until the court was solemnly called on in writing to file their opinion, that it might be recorded as a precedent, I could not bring myself to believe they were serious. I do not know but from the love of quaintness, which distinguished the learned of that day, *49 and from which the sages of the law were not quite exempt, they might have reasoned thus. When the defendant said, “ thou hast killed my wife,” he did not mean to convey the idea to his hearers, that his wife was dead, for if she was dead, he could not say my wife; for she had ceased in fact to be his wife, and in the eye of the law she was not his wife, for he might legally marry another, and he could not have two wives. For about that time it was decided, that an action could not be supported against husband and wife for these words spoken by the wife, “ thoii hast stolen my goods.” Because, as the court said it was impossible, that a feme covert could have any goods. About the same time it was determined, that it was not actionable to say, you stole my master’s tobacco without showing that his master had any tobacco to steal; if he had none to steal, ergo, the plaintiff could not steal it; ergo, he could not possibly be guilty of stealing it, ergo, the words were not actionable. This mode of deciding in actions for words, which the judges are desirous of discouraging, was the infirmity of the courts, though the judges were men of knowledge and abilities. Such was the law, and such the reasoning of Westminster Hall on this species of action, for it really was decided, and by those very judges who sat in Snag v. Gee, that to say you killed J. S. is not actionable; for peradventure you might have put an end to his life as a hangman, or killed him in battle or by physic. So to say, that he coined gold and was a coiner of gold, because he might have been employed in the mint. So if one say, “ he hath stolen by the hedge way side.” for it may be a stick, or an apple from a tree. He forged my father’s will: not actionable, because if forged, not his will. Winch. 49,40.1 give these as specimens, and I refer those who have any curiosity, to 1 Vin. 500, and the following pages, where they will find a precious collection of cases. Even so late as Charles II. Carter, 55, it was decided, that to say of a virgin, that she had a child and made away with it, was not actionable: because there may be a mode of making away with a bastard without killing it; against the strong remonstrance of Chief Justice Bridgman. In the days of Elizabeth and James, no action could be supported by the chastest maid, for charging her with killing her bastard child,' because never having had a child she could not possibly kill it; consequently her life could not be in jeopardy: consequently it was no defamation. Nothing can be more fallacious than the reasons given for the decision of Snagg v. Gee. For men have been executed for the murder of persons who haye afterwards appeared. The noted case of execution on presumptive evidence, stated in Colee on Littleton, of the uncle and niece, and many others to be found in Philips’s Appendix. It is surprising that the acute mind of Mr. Puller did not discover the folly, and that he should have stated it as the law in his Nisi Prius-, and no otherwise .to be accounted for than that he was then a very young man, and the book intended as a convenient one to carry with him on circuit for his own use. In *50 that yiew it is a useful book. The respectable court who decided this cause were led into error in the hurry of a trial, by giving this case the weight' of precedent, and authority binding on them, and following so great a name as Justice Butter, will account for the error into which they have been surprised. But I will now proceed to show, that the case of Snag v. Gee, if it has not been expressly overruled, yet has not been considered with much respect. In Ellwine v. Moore, Noy’s Rep. 55 — Thou art a thief, and hast robbed my son, actionable. The first words actionable, and the second so; because of discrediting the party in the audience of others, who knew not if he had a son; and this without averment or proof that he had a son.' And action was brought for saying that he murdered his late servant, without averring that she was dead. Motion in arrest of judgment, but curia contra; for if she were not dead, orif there was nonesuch the scandal is thegreater. 3 Keble, 634. And in Smith v. Williams, Carth. 247, case for these words, “ he confessed that he was the man who robbed the Hockley butcher” Counsel moved in arrest of judgment, that it did not appear, that there was any Hockley butcher, and cited Snag v. Gee, that action does not lie for these words, “ thou hast killed or murdered A. B.” without averment that he is dead. But Holt, Chief Justice, scouted at this, and directed judgment exclaiming, “ the fault is the greater, and it is a double crime.” But if we are to be governed by the precedent of this Snag case, let us examine other decisions of that day, and there will be found enough to support this action. The reason I admit equally ridiculous in both cases. If one says to B., thou hast poisoned J. S., though he be living, yet action lies. For one may be poisoned, and yet not to death: for it might break otherwise as in biles, vomiting, &c. Per Yeuverton, Justice, Yelv. Rep. 35. So here, “ you have poisoned Bob Waters;” and if one say of another, you poisoned your own aunt, and I make no question but to prove it, actionable, though the aunt never was poisoned. So to say, that he is perjured in this court, though he never was sworn, and therefore could not possibly be guilty of perjury. Webb v. Poor, Cro. Eliz. 569. Noy, 63, S. C., with this addition, because one may be poisoned, and ye.t may not’die. If one was not ashamed to resort to such miserable reasons, here is law for it. If Bob Waters was dead, the action would lie, you killed him. If he was not dead, “you poisoned Bob Waters,” so that Bob Waters living or dying the action is supportable, you poisoned him is enough.
These scholastic divisions without distinction, and distinctions without differences, this quaintness in argument, was not in that age peculiar to the bar and the bench: it infected the throne and the pulpit, as well as the schools. Shakspeare, in the church yard scene in Hamlet, finely ridicules this false taste and false reasoning, and he must have drawn the likeness for it, for it is not a caricature, from this case of Snag. The grave argument of the grave- *51 makers discussing the point, whether the fair Ophelia drowned herself.?e off enciendo or wittingly, thus gravely puts it: “1st Clown. It must be se offendendo, it cannot be else. For here lies the point. If I drown myself wittingly, this argues an act, it is to act, to do, and perform. Argal,she drowned herself wittingly. The 2d Clown, who had the reply, thus argues the topic: There lies the water, good: here stands the man, good. If the man goes to this water, and drowns himself, it is will he, nill he, he goes, mark you that: but if the water comes to him and drowns him, he drowns not himself, Argal, he that is not guilty of his own death, shortens not his own life, and this is law and crowner’s quest law, and she is entitled to Christian burial.”
Coke’s Institutes, the standard book of law, excellent and valuable as it is, contains so much of this quaintness, that it provoked one of his descendants after reading it to say, “ that he did not know before, that his ancestor was the author of a jest book.”
But quitting these antiquated notions, the common sense conclusion is that stated by Lord Mansfield, in Peake v. Oldham, Cowp. 287, “where words from their general import, have been spoken with a view to defame the party, the court ought not to put a different construction, from which they bear in their common acceptation and meaning of them.” Words that on their face import such a defamation as may be injurious toaman, must be actionable: and what makes this the strongest case, that can be imagined is, that the defendant did not state the death of Waters as a doubtful or conjectural matter. He asserts the fact of his death, that Eckart killed him, designating the particular manner and cause of his death: and to impress the audience more deeply with the truth of his assertion, points towards the very witness by whom he undertakes to prove the murder. The judges’ notes show the cause and occasion of speaking the words, and they áre now filed with this opinion. It was a matter of indifference whether one or more of the plaintiff’s witnesses believed Waters to be living, (though Mr. Brisber swears he had no idea but he was living,) yet when the plaintiff desired him to mind what the defendant said, his answer was, that no body who knew him would believe it, to which the plaintiff very naturally replied, that it might be cast up to him and his family. In Butler’s Nisi Prius, where Snag’s case is introduced, the reason is given why the action would not lie, because the plaintiff could not be guilty of the murder of a man who is alive, and, therefore, put in no jeopardy from the defamation, is founded, as I have already stated, on the assumption of a fact, which judicial record and history informs us, is not true. For many menhave been executed- for the murder of those who afterwardshave appeared. It is actionable to say of a virgin, that she is a man and got A.’s wife with child; yet if this principle contended for be true, ‘this could never be, for the circumstance of her being a man would prove the truth of the words, at least prove her to be an impostor, and she could not reóover; and *52 if she were not a man, it was impossible she could beget a child. So that if she be man or woman, she could maintain no action. But Mr, Buller has modified Snag v. Gee, and added a qualification no where else to be found; that such matter cannot be given in evidence on the general issue, otherwise, .than in mitigation of damages; to be a bar it must he specially pleaded; and here the opinion of the court was given on the trial of the general issue. So that on the issue in fact, the plaintiff is out of court, and never can have his demurrer to the special plea put in in this case argued, and the defendant in error contends, that the cause should be sent back to the Court of Common Pleas, to render a judgment on the demurrer, and that the court should quash the writ as it issued before final judgment. The question of fact being decided in favour of the defendant, on the general issue, rendered the decision of the question of law unnecessary. Neither party could call for the judgment of the court on this. Not the plaintiff, for the question of fact had been found against him. He was out of court. Not the defendant, to be sure, for he had been found not guilty of the fact: so that no question of law remained on the record to be decided, and judgment was defectively entered for the defendant.' On demurrer to part, and issue to part, it is the best way to dispose of the questio juris first; yet the court may, in their discretion, try the question of fact first. If the jury find the fact for the plaintiff, they assess contingent damages, subject to the opinion of the court on the question of law. But if the question of fact is found in favour of the defendant, there remains no question of law; for ex facto oritur jus. Then according to Buller and his commentary on Snag v. Gee, there is error. For on the trial of the general issue, the fact of Waters being alive, was only evidence in mitigation of damages, and the court have decided that it was a flat bar to any recovery. But if this court were of opinion, that the plea in bar was a good one, it would answer no purpose to the plaintiff in error to reverse the judgment and remit the record on the ground of error on the trial of the issue. But the court reverse it on the ground, that the fact of Bob Waters, being alive does not deprive the plaintiff of remedy in this action. It may be given in evidence to the jury and would go in mitigation or increase of damages, as the jury,under aB the circumstances, might think just: but it would bring reproach on the administration of justice, if it were so, that the plaintiff had a cause of action for the foul imputation of murder, carried on for years, at great costs and expense, and when, at last, it was on trial, the man supposed to be murdered should, to the surprise of every body, stalk into the court house, that the slanderer who under'took to prove his death should go scot free because it then appeared he had published a most circumstantial falsehood; and that the very lie which was aggravated by the circumstance of the man being in full life, whose death he undertook to prove, and the mode of it by poison, should screen him, and the slandered man should be driven *53 out of court and punished with.costs pro falso clamare against the calumniator, and that, as Lord Chief Justice Holt says, merely because he had committed a double crime. Nothing which is so much at variance with common sense, can be consistent with the common law, which we proudly boast of, as the perfection of human reason. It has no relation to the cases put of a man charging another with stealing a tree, because he could not steal a tree. But not so of Bob Waters: he could be killed: the killing of him would be murder.
The evidence of the subsequent declaration of the defendant, respecting Eckart, as they contained a new and substantive charge of a distinct indictable offence, affording a new cause of action, I am of opinion, were properly rejected. This in all cases is a dangerous kind of evidence: for though admitted to show quo ariimo the words laid in the declaration were spoken, yet they will naturally have an influence on the jury in assessing the damages. No man in the jury box, let the instruction of the court be what it might, but would be influenced by a repetition of petty vindictive and malignant stories, and sly hints of the defendant, showing an inveterate malice towards the plaintiff, which the defendant having no notice of, could neither disprove nor explain. As far as decisions have gone, I am not yet prepared to oversetthem: though I confess, I submit to them with reluctance. But when the words, as here, give the party a new action, it would be punishing twice for the same offence, and giving the plaintiff a chance of recovering double damages, for the the same injury. The distinction is, between words which are not actionable, and those which are. The first might be given in evidence but not the last: unless they relate to the same subject. The evidence offered falling within the last class, was properly rejected.
In the argument another point was made by the defendant, that the writ of error was not allowed. This objection comes too late. A writ of error in a civil action is as much a writ of right and of course, as a summons in debt. It does not depend on any special allocatur as in indictments. The appearance of defendant cured the defect. He not only entered a full appearance, but joined issue on the assignment of errors. The argument began, before the objection was made, or perhaps the omission discovered. If a cause was on trial, and the defendant hard pushed, discovered that the original writ was not signed by the clerk, this would not arrest the trial, nor be a reason for reversing the judgment. This court sits for other purposes than to delay suitors by picking little holes in straggling records, mere* clerical omissions will be overlooked. If it were necessary, the court would now sign the allocatur nunc pro tunc. There is enough to amend by the praecipe,
Thus we have given our opinion and filed it of record, as we were requested by the counsel of the defendant. The case was so plain, that otherwise the court would .have contented themselves with *54 giving a short per curiam opinion. But respect for the counsel who desire it, has induced us to enter more into detail, and a review of ancient decisions than we would have thought necessary; and as we have been earnestly admonished of the danger of departing from precedent, and forewarned of the dreadful consequences which would arise from not being governed by an ancient precedent in an action for words, as tending to disturb settled rules and remove the ancient landmarks of the law, as if real danger was to be apprehended by departing from a decision in an action of slander, made more than 100 years ago, however shocking it might be to reason and justice: and therefore it becomes us deliberately to consider these decisions, and the result of a pretty laborious investigation, which would have been very dry and wearisome, if they had not been so pleasantly ridiculous as to keep one awake. The result is that there is no such established rule as that contended for, and that these antiquated decisions in action for words have been long disregarded and cast aside as the mere rubbish of the law, and in place of that jargon of miserable decisions which dishonoured it, we find a plain intelligible rule, neither mysterious nor cabalistic, which governs the construction applicable to every species of slander; do they impute an indictable offence of moral turpitude? If they do, no subsequent explanation given on the trial, showing a reference to a transaction in its nature not indictable, or that the imputation was of an impossible offence, as it afterwards appeared, can shield the slanderer from the whole texture of these words intrinsically considered as they ought to be and explained as they appeared to be, by the time and manner of speaking them. It evidently appears that the conversation respected the existence of Waters, of whom the plaintiff stated, circumstantially and not conjecturally, that, he was murdered by the plaintiff. The charge had no relation to him as a living man, but was a solemn asseveration of his murder, and if this is not actionable, there is no security for character but in the arm of flesh. The people will take vengeance in their own hands, finding the courts of justice are shut against them, and instead of actions of slander, we shall have indictments for murder. .1 shall now close my observations on the omnipotence ascribed to the farrago of cases on slander to be found in Coke, Croker, and the other reports of their day, by showing the light in which they were considered by a luminary of the law, Chief Justice Holt, in Park v. Penal, 6 Mod. 24. I use his own words; “the opinions of latter times' have been in many instances, different from those of former days, and I have heard my Lord Hale and Justice Twisden, saythattheyknewno'setnules for actions of slander; they stood on their own feet. The decisions were stumbling things going backwards and forwards, it is not worth while to be learned on this subject: for where words tend to take- away a man’s reputation, I would encourage these actions, because they tend to preserve the peace,’’ and see the brief report by Sir John Strange, of *55 the case of Rivers v. Lite, 2 Stra. 1120, in which the question was, whether particular words were actionable. It was a writ of error from the Common Pleas. He thus shortly disposes of the case, “ and the court decided that they were, notwithstanding the long string of old cases to the contrary,” and affirmed the judgment. So here, the judgment is reversed, however long the old string of cases to the contrary.
Judgment reversed and a venire facias de novo awarded.